# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs August 2, 2016

## IN RE DAKOTA H. ET AL.

**Appeal from the Juvenile Court for Anderson County**
**Nos. J-28985, J-28988, J-29004     Darryl Edmondson, Judge**

---

### No. E2016-00036-COA-R3-PT-FILED-OCTOBER 12, 2016

---

This is a termination of parental rights case focusing on the three minor children of Bobby H. ("Father"). On March 11, 2015, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Father. DCS alleged as a basis for termination the statutory grounds of (1) abandonment by failure to provide a suitable home, (2) substantial noncompliance with the permanency plans, (3) persistence of the conditions leading to removal of the children, and (4) mental incompetence preventing adequate care of the children. Following a bench trial, the trial court granted the petition upon its determination by clear and convincing evidence that DCS had proven the statutory grounds of abandonment by failure to provide a suitable home and persistence of the conditions leading to removal of the children. The court further determined by clear and convincing evidence that termination of Father's parental rights was in the children's best interest. Father has appealed. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which RICHARD H. DINKINS and ARNOLD B. GOLDIN, JJ., joined.

J. Wade Jenkins, Knoxville, Tennessee, for the appellant, Bobby H.

Herbert H. Slatery, III, Attorney General and Reporter, and Rachel E. Buckley, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

## OPINION

### I. Factual and Procedural Background

Father appeals the termination of his parental rights to his three minor children: Dakota H., Hunter H., and Brianna H. ("the Children"). Melissa S., a resident of Oregon, is the biological mother of Dakota H. Her parental rights had not been terminated at the time of the trial court proceedings, and she is not a party to this appeal. Heidi M. is the biological mother of Hunter H. and Brianna H. Heidi M. surrendered her parental rights on October 22, 2014. She is also not a party to this appeal.

The trial court entered an order dated August 13, 2010, removing the Children from the custody of Father and Heidi M. due to environmental neglect and sexually reactive behavior by Dakota H., who was eight years old at the time of removal.[1] DCS alleged in the removal petition that despite DCS's provision of services to the family prior to removal, the environmental neglect had not been remedied because Father had refused to cooperate with services. DCS also alleged that Dakota H. sexually abused a younger sibling and that he had disclosed his observation of sexual acts committed by Father and Heidi M. The trial court subsequently entered a preliminary hearing order on August 17, 2010, finding that DCS had established probable cause to show that the Children were dependent and neglected based upon the allegations contained in the petition and Father's waiver of the preliminary hearing. The Children were placed in foster care, and an initial permanency plan was developed with Father and Heidi M. on September 8, 2010.

On November 24, 2010, the trial court entered an order allowing Father and Heidi M. to exercise unsupervised visitation with the Children because Father and Heidi M. had obtained appropriate housing and had completed several requirements of the permanency plan.[2] However, on December 9, 2010, the court entered an order reflecting that new allegations had been made by the Children. A subsequent permanency plan was created on December 10, 2010.

The trial court entered an adjudicatory hearing order on October 27, 2011, determining the Children to be dependent and neglected due to Father's, Heidi M.'s, and Melissa S.'s stipulation of environmental neglect. Father and Heidi M. were allowed to resume weekend visitation with the Children with a safety plan in effect. On December

---

[1] This order does not mention Dakota H.'s biological mother, Melissa S., apparently because the Children were removed from the custody of Father and Heidi M.

[2] The record is unclear regarding why Heidi M. was granted visitation with Dakota H., except that it appears Father and Heidi M. were living together at the time and were being treated by DCS as a couple.

5, 2011, the court allowed the Children to return to Father and Heidi M. pursuant to a trial home visit. This trial home visit included a safety plan whereby Dakota H. would not be left unsupervised with his siblings and would sleep in a room alone with an activated alarm on the door.

On March 26, 2012, the trial home visit was disrupted due to new allegations of sexual behavior by Dakota H. DCS alleged that Father and Heidi M. had failed to properly supervise Dakota H. with the other minor children. DCS developed a subsequent permanency plan on April 2, 2012. On August 16, 2012, DCS filed a motion requesting that visitation with Father and Heidi M. be halted, due to allegations made by the service worker regarding "sexual grooming" behavior exhibited by the Children during visitation.[3] The trial court established a no-contact order, which was in effect until January 2013, at which time Father and Heidi M. completed non-offender classes.

On September 16, 2013, DCS filed a motion seeking proof of compliance from both Father and Heidi M. DCS alleged that Father had not allowed DCS to have access to his home for approximately one year. Therefore, DCS was unable to verify whether the home was suitable for the Children. DCS created subsequent permanency plans in December 2013, June 2014, and December 2014. Following Heidi M.'s surrender of her parental rights in October 2014, DCS filed a petition to terminate Father's parental rights on March 11, 2015.

The trial court conducted the termination hearing on November 24, 2015. The only witnesses to testify were Jennifer Vowell, the foster care worker for DCS, and Father. Following the bench trial, the court entered an order terminating Father's parental rights. The court determined that DCS had proven by clear and convincing evidence the statutory grounds of (1) abandonment by failure to provide a suitable home and (2) persistence of the conditions leading to removal of the Children.[4] The court further determined by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.[5] Father timely appealed.

---

[3] The DCS foster care worker described this behavior as a "lead-in for sexually reactive play."

[4] At trial, DCS voluntarily nonsuited its claims regarding substantial noncompliance with the permanency plans and mental incompetence to care for the Children.

[5] Because Melissa S.'s parental rights had not yet been terminated, the trial court entered a partial order of guardianship with regard to Dakota H. The trial court also certified the order as final pursuant to Tennessee Rule of Civil Procedure 54.02.

## II. Issues Presented

Father presents one issue for our review, which we have restated as follows:

1. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

In addition, DCS raises the following issues, which we have restated slightly:

2. Whether the trial court erred by finding clear and convincing evidence that Father abandoned the Children by failing to provide a suitable home.

3. Whether the trial court erred by finding clear and convincing evidence that the conditions leading to removal of the Children from Father's home persisted.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

5

IV. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (Supp. 2016) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Father's parental rights: (1) abandonment by failure to provide a suitable home pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and (2) persistence of conditions leading to the Children's removal pursuant to Tennessee Code Annotated § 36-1-113(g)(3). Father has not raised either statutory ground as an issue on appeal; instead, he has only raised the issue of whether the trial court properly found that termination of his parental rights was in the Children's best interest. DCS has argued in favor of affirming the statutory grounds in its responsive brief, although Father has not filed a reply brief with any response to these arguments. Due to the fundamental constitutional interest involved, we will address the statutory grounds as well as the best interest analysis. *See In re Carrington H.*, 483 S.W.3d at 525; *see also In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

A. Abandonment by Failure to Provide a Suitable Home

The trial court found that Father had abandoned the Children upon the statutory ground of failure to provide a suitable home. Regarding this ground, Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

(g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

    (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (Supp. 2016) provides:

(ii)    The child has been removed from the home of [a] parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [a] parent or parents or a guardian or guardians to establish a suitable home for the child, but that [a] parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.  The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . .

(Emphasis added).

In its final judgment, the trial court made the following specific findings regarding this statutory ground:

The Juvenile Court adjudicated the children dependent and neglected and placed them in DCS custody, pursuant to a petition filed in Juvenile Court, after they were removed from [Father's] home on August 13, 2010.

The Juvenile Court's protective custody order approving the removal found that the Department made reasonable efforts to prevent removal.

In the over five years since the removal, the Department has made reasonable efforts to assist [Father] to establish a suitable home for the children by: referring intensive in-home services on multiple occasions, non-offender parenting classes on three occasions, a bonding assessment, two psychological evaluations; providing transportation; providing resources for HUD [U.S. Department of Housing and Urban Development] and local housing authorities; assisting with rent and utility payments; and providing therapeutic visitation, facilitating supervised visitation, placing the children on trial home visit; conducting multiple child and family team meetings; creating multiple permanency plans; assisting the father to develop a safety plan; assisting with ETHRA [East Tennessee Human Resource Agency]; contracting for family therapy; providing counseling resources to the father; contracting for counseling for the children; and providing foster, medical, dental, and psychological care for the children.

[Father] has made little reasonable efforts to provide a suitable home. Instead, he delayed applying for housing vouchers for suitable housing, he has not demonstrated learned parenting skills during visitations, he did not follow the safety plan in place while the children were on a trial home placement and the trial home visit disrupted, he does not appear to be able to supervise all the children at the same time during visitations, and he allowed inappropriate behaviors to continue between the children during the trial home placement, he does not have suitable housing or transportation for the children, and he testified that he could have all of the children in a one bedroom apartment even though the psychological professionals told him he could not.

The father has made little or no effort to obtain housing for the children except for a one bedroom apartment, which is not suitable for himself and three normal children, and especially not suitable for these sexually reactive children.

[Father's] failure to improve his home and personal condition demonstrates a lack of concern for the children to such a degree that it

appears unlikely that he will be able to provide a suitable home for the children at an early date.

(Paragraph numbering omitted.) The trial court therefore determined that DCS had proven by clear and convincing evidence that Father had abandoned the Children by failing to provide a suitable home. Upon our thorough review of the evidence, we agree.

These Children were removed from Father's home and placed into DCS's custody on August 13, 2010, more than five years prior to the termination hearing. According to Ms. Vowell, the DCS foster care worker assigned to this family, DCS had been working with the family for a few months before the Children were removed, providing in-home services to help remedy the environmental neglect found at the home. According to Ms. Vowell, at the time the Children were removed, Father's home was dirty and had rooms that were unusable because they were packed full of belongings. She also noted that Dakota H. had exhibited sexually reactive behaviors with his siblings.

Ms. Vowell testified that Father did not cooperate with the in-home services, such that the home conditions were not improving. Ms. Vowell also related that Father did not monitor Dakota H. appropriately with regard to his interactions with his siblings. Thus, despite DCS's provision of services, the Children had to be removed from Father's home and placed in foster care. DCS continued to provide services to Father, including non-offender parenting classes, a mental health assessment, in-home services, therapy, supervised visitation, and other assistance geared toward reunification of Father and the Children. DCS also paid rent for Father in November 2010.

Father completed non-offender parenting classes for the first time in March 2011. Ms. Vowell stated that these classes were designed to instruct parents concerning issues that sexually reactive children face and also to provide parents the skills and knowledge to encourage healthy sexual development in those children. While the Children were in foster care, DCS supervised visits between Father and the Children until the trial court allowed unsupervised visits beginning in October 2011. Father and Heidi M. had obtained new housing and completed sufficient requirements of the permanency plans such that a trial home visit began in December 2011.

Unfortunately, the trial home visit was disrupted in March 2012 when a younger sibling disclosed that Dakota H. had sexually abused him. When questioned, Dakota H. stated that Father was not setting his door alarm at night as the safety plan required. Consequently, DCS returned the Children to foster care and provided intensive in-home services and a second series of non-offender classes to Father. Father failed the non-offender parenting test, however, and had to retake the classes in 2015. DCS also

9

provided Father with resources to apply for low-income housing and transportation to his meeting with the housing authority.

Meanwhile, therapeutic visits between Father and the Children continued, but the service worker noticed inappropriate behaviors occurring during these visits. For example, the service worker reported that the Children would sit in Father's lap inappropriately (over the groin area), and a female child was observed rubbing her foot up and down Father's leg. The Children were also observed playing a "sexual grooming game" on more than one occasion, and Father failed to stop this behavior. The service worker also noted that Father seemed unable to control the Children, stating that during one visit a child was throwing a tantrum and almost ran into traffic. Father self-reported that he had disciplined a child by restraining the child in a chair, and Father also acknowledged that he felt he could not discipline the Children during the therapeutic visits.

Father explained that after he and Heidi M. parted ways in 2012, he lived with Heidi M.'s father for a period of more than one year. Father admitted that Heidi M.'s father would not allow DCS workers to enter the home. Father related that he moved in with friends in February 2014, where he occupied only one bedroom of the home. Father then moved to his own one-bedroom apartment in September 2015, approximately two months before the termination hearing.

Ms. Vowell testified that Father had known from the time of the Children's removal that he needed to obtain and maintain safe, stable, and suitable housing. According to Ms. Vowell, parents were taught during the non-offender parenting classes that a child subjected to sexual abuse at a young age should not share a bedroom with another child. Father admitted that he knew Dakota H. had exhibited inappropriate sexual behaviors before DCS became involved. Despite this knowledge, Father continued to maintain at trial that the Children could be returned to him in his one-bedroom apartment, where he would provide separate sleeping cots for the Children. While Father admitted that his young daughter had reported sexual behavior perpetrated by Dakota H. in 2010, Father stated that he was not sure the behavior actually happened. He also accused the service worker of lying concerning the disclosure of abuse made by the Children after the trial home visit was disrupted. As the trial court observed in its ruling from the bench, Father appeared to be "just failing to accept that these are—this is at least one child that has very, very, very serious problems."

In summary, Father has had more than five years to (1) come to terms with and understand the issues facing Dakota H. and the other Children, (2) avail himself of the services offered by DCS in order to obtain and maintain suitable housing, and (3) demonstrate that he possesses the skills and ability to effectively parent all three Children

and prevent them from harming themselves or others. Despite significant efforts on the part of DCS, Father has simply failed to demonstrate that he can provide a suitable home for the Children, and he has not made reasonable efforts to provide a suitable home. Furthermore, the passage of five years with little improvement in Father's situation demonstrates a lack of concern for the Children to such a degree that it appears unlikely that he will be able to provide a suitable home at an early date. We conclude that a preponderance of the evidence supports the trial court's factual findings as to Father's abandonment of the Children by failing to provide a suitable home and that clear and convincing evidence established this statutory ground. We therefore affirm the trial court's determination regarding this ground for termination of parental rights.

### B. Persistence of Conditions Leading to the Children's Removal

The trial court also found clear and convincing evidence of the statutory ground of persistence of conditions leading to removal of the Children from Father's home. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . .

In its final judgment, the trial court made the following specific findings regarding this statutory ground:

> It has been over five years since the Juvenile Court's protective custody order removed the children from the father's home.

DCS removed the children from their home because of environmental neglect and inadequate housing, parental noncompliance with services and noncompliance with the safety plan created due to sexual contact between the siblings.

The conditions that led to the removal still persist[.] The father has not obtained and maintained safe and stable housing suitable for the children, and he has allowed inappropriate contact between the siblings during trial home placements and visitations.

There is little chance that those conditions will be remedied soon so that the children can be returned safely to the home because, for over five years, DCS made the above listed reasonable efforts to help the father remedy them, to no avail.

Continuation of the parent/children relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home.

Having carefully reviewed the record, we agree with the trial court's findings. Again, Father has had more than five years to address the conditions that led to the Children's removal and other conditions that would, in all reasonable probability, cause the Children to be subjected to further abuse or neglect, despite more than reasonable efforts by DCS. In addition, as the trial court noted, Father seems to lack the willingness or ability to accept the severity of the situation, such that there is little likelihood that he will remedy these conditions in the near future. Although Father admitted that he suspected Dakota H. had been sexually abused and had resultant issues even before DCS became involved with the family, Father then discounted the reports of abuse by Dakota H.'s siblings. Clearly, continuation of the parent-child relationship diminishes the Children's chances of being placed in a safe, stable, and permanent home. We conclude that a preponderance of the evidence supports the trial court's factual findings as to persistence of the conditions leading to removal of the Children from Father's home and that clear and convincing evidence established this statutory ground as well. We therefore affirm the trial court's determination regarding this ground for termination of parental rights.

## V. Best Interest of Children

When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See White v. Moody*, 171 S.W.3d 187,

192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by the establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White*, 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

13

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Regarding the best interest analysis in this matter, the trial court found:

It is in the children's best interests for termination to be granted, because the father has not made changes in his conduct or circumstances that would make it safe for the children to go home.

It is in the children's best interests for termination to be granted, because the father has not made lasting changes in his lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.

It is in the children's best interests for termination to be granted, because changing caregivers at this stage of their lives will have a detrimental effect on them.

It is in the children's best interests for termination to be granted, because the father's mental or emotional state would be detrimental to the children and would prevent him from effectively parenting the children.

It is in the children's best interest for termination to be granted because [] Brianna and Hunter have lived with their foster parents for virtually their entire lives, and call them mommy and daddy.

It is in the children's best interest for termination to be granted because Brianna and Hunter share a bond and love with their foster parents.

It is in the children's best interest for termination to be granted because they were dependent and neglected in the care of the father.

It is in the children's best interest for termination to be granted because Brianna's and Hunter's foster parents wish to adopt them, and have safe and adequate housing, income and transportation to care for the children.

It is in the children's best interest for termination to be granted because the foster parents have provided care for Brianna and Hunter for

14

five years, including facilitating extensive counseling and following safety plans.

It is in the children's best interest for termination to be granted because Dakota is in a residential facility with specialized treatment for severe sexually reactive behaviors, and the father cannot provide such care to Dakota, and Dakota needs to stay in the State contracted facilities and programs until he makes sufficient progress to step down.

(Paragraph numbering omitted.)

Following our thorough review of the evidence presented, we agree with the trial court's findings. At the time of trial and after more than five years of DCS's assistance, Father had not made sufficient adjustment to his circumstances or conduct so as to make it safe and in the Children's best interest to be in his home. Father had not obtained or maintained a home suitable for the Children, and he seemed unable to accept the severity of the issues confronting the Children. The Children had been in DCS custody for over five years, which is such duration of time that lasting adjustment does not reasonably appear possible. Father did visit regularly with the Children, but he admitted that his bond with Hunter H. and especially Brianna H. was not as strong as it was with Dakota H. because the younger children were only months or days old, respectively, when they were removed from Father's custody.

Ms. Vowell's testimony established that a change of caretakers and physical environment would likely have a detrimental effect on the emotional and psychological condition of all three Children. Brianna H. and Hunter H. had been in the same foster home since their removal from Father in 2010, which was virtually their entire lives. Ms. Vowell testified that Brianna H. and Hunter H. were extremely bonded to their foster parents, referring to them as "mommy" and "daddy." According to Ms. Vowell, the foster parents loved these children and wished to adopt them and provide permanency for them. Furthermore, the foster parents were able and willing to provide for all of Brianna H.'s and Hunter H.'s needs.

At the time of trial, Dakota H. was residing at a residential treatment center, where he was receiving intensive treatment for his sexually reactive behaviors. As Ms. Vowell explained, although Dakota H. was making progress, he still required considerable supervision and therapy because he experienced incidents of sexually reactive behavior every month or two on average. Ms. Vowell stated that while DCS intended to maintain contact among the siblings, Dakota H. would need to remain at the residential treatment center until his issues were resolved and would not be adopted by the foster parents who wished to adopt Brianna H. and Hunter H. Ms. Vowell's testimony demonstrated that

15

Dakota H. was in the best placement for his needs and that Father would not be able to meet those needs if Dakota H. were returned to Father's care.

Testimony also established that even though there was no report of ongoing criminal activity in Father's home, Dakota H. was subjected to inappropriate sexual behavior while in Father's custody, which had the effect of causing Dakota's sexually reactive behaviors. Although Father blamed Melissa S. and/or her family, Dakota reported having witnessed sexual acts of Father and Heidi M. at the time of removal when he was only eight years of age. In addition, Father previously stipulated that the Children were dependent and neglected when they were removed from his care.

According to Ms. Vowell, despite the provision of non-offender and other parenting classes, as well as intensive in-home services, Father had not demonstrated the ability to incorporate what he had learned into his parenting of the Children. As the trial court noted, Father did not seem to appreciate the severity of Dakota H.'s behaviors or the trauma that all of the Children had experienced. Furthermore, he did not seem to possess the ability or inclination to properly address this concern. It would therefore appear that Father's mental and/or emotional status would be detrimental to the Children and prevent Father from effectively providing safe and stable care and supervision for the Children. Finally, there was no proof regarding the payment of child support.

Based on our review of the evidence in light of the statutory factors, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Father's parental rights was in the best interest of the Children. We affirm the trial court's determination regarding the Children's best interest.

## VI. Conclusion

For the reasons stated above, we affirm the judgment of the trial court terminating the parental rights of Father in all respects. Costs on appeal are taxed to the appellant, Bobby H. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

16